UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:14 CR 66 SNLJ (ACL) |
| | ) |
| BOB L. WOODS, | ) |
| | ) |
| Defendant. | ) |

# REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). Pending before the undersigned is Defendant Bob L. Woods' Motion to Suppress (Doc. 19) evidence obtained from his vehicle, as well as statements he made on April 9, 2014. Woods argues that his vehicle was unlawfully stopped and he was unlawfully detained. He further argues that any incriminating statements that he made were taken in violation of his constitutional rights, because he refused to sign a *Miranda* Waiver form. The Government filed a Brief in Opposition to Woods' suppression motion. (Doc. 21) Following an evidentiary hearing (Doc. 32), both parties submitted memoranda. (Docs. 48, 49)

In consideration of the pleadings identified above, as well as all exhibits admitted into evidence, the undersigned recommends that the following findings of fact and conclusions of law be adopted and that the Defendant's Motion to Suppress be denied.

## I. Findings of Fact

Woods is charged with possessing methamphetamine with the intent to distribute, being a felon in possession of a firearm, and possessing a firearm in furtherance of drug trafficking. (Doc. 1.) Woods has prior felony convictions for Unlawful Use of a Weapon (2005) and Possession of a Controlled Substance with Intent to Sell/Deliver (2007). *Id.*

On April 9, 2014, law enforcement officers were eating lunch at the McDonald's located off Ivie Street and near an Interstate 55 exit in Portageville, Missouri. As the officers departed the restaurant, they noticed Woods going through the drive thru window.[1] After pulling out of the restaurant parking lot, Officer DeLisle watched Woods pull out of the McDonald's parking lot and throw a piece of paper out of the driver's side window. Another officer was with Officer DeLisle; he also observed an object being thrown out the driver's side window. The officers also noticed that Woods' windows were tinted. Officer DeLisle stopped the Cadillac that Woods was driving based on his observation of Woods littering and to investigate whether or not Woods' window tint was darker than allowed by law. The stop was made at 12:46 p.m., after the Cadillac had entered the on ramp that accesses Interstate 55 from Ivie Road.

Prior to this incident, Officer Delisle had two prior interactions with Woods. The first time was related to careless and imprudent driving and leaving the scene, and Woods was convicted in municipal court. The second was related to an allegation that Woods had violated a noise ordinance. In addition, Officer DeLisle had received intelligence

---

[1] The parties stipulated that a McDonald's employee observed between one and five officers in the restaurant when Woods was in the drive thru and that they got up and left at that time.

information from other law enforcement officers and local citizens that Woods was involved in the drug trade and that Woods had hidden compartments in his vehicle that could be used to transport drugs.

Following the stop and Officer DeLisle contacting Woods in the driver's seat, Woods exclaimed, "you're going to f--- with me over a straw wrapper?" Officer DeLisle advised Woods that he was also concerned about the window tint. When the tint was measured it was found to be less than 35 percent, which was legal. Woods did not have proof of insurance available at the time of the stop, so Woods' girlfriend brought a copy of the car insurance to the location of the stop. By the time she arrived, Officer DeLisle had already issued traffic citations to Woods for littering and failure to provide proof of insurance.

Another officer responded to the scene to assist with the traffic stop and made contact with the passenger in Woods' vehicle. That officer and Officer DeLisle compared the information they'd received regarding the destination of the pair. Woods stated they were going to Kennett and the passenger said they were going to Memphis.

During Officer DeLisle's initial contact with Woods, Officer DeLisle observed what he believed to be a fake i-Phone that actually contains digital scales in the driver's side door pocket. He also detected a faint odor of packaged marijuana. Officer DeLisle asked Woods for consent to search the vehicle and Woods gave consent for the search. Based on the odor of marijuana, the discrepancy between the driver and passenger as to their destination, and the intelligence regarding Woods' involvement in drug trafficking

and hidden compartments for transporting drugs, Officer DeLisle requested that a canine officer respond to the scene.

Officer DeLisle estimated that it took between fifteen and twenty minutes to address the issues related to the traffic stop. He also testified that once he requested a canine officer to respond to the scene, it took approximately twenty or thirty minutes for the canine officer to arrive.

Deputy Bryan Burgess, a canine officer with the Pemiscot County Sheriff's Department, responded to the scene at 1:24 p.m., and directed Canine Shockey to conduct an exterior sniff of Woods' vehicle. Deputy Burgess was not on duty at the time of the call, but responded to the scene as requested. The canine alerted to the driver's side door by sitting and facing toward the rear of the vehicle. Woods' car was impounded and taken to a garage where the canine again performed an exterior sniff and made a similar alert to the driver's side door and then to the rear passenger seat. Under the rear seat, officers discovered a box containing marijuana, methamphetamine, and cocaine packaged for sale, as well as a firearm.

Woods was taken to the station following the traffic stop, because he became uncooperative when Officer DeLisle attempted to explain the citations that had been issued. The arrest was made, because Woods was going to be required to post a bond. At the station, Woods was given the *Miranda* warning and presented with a waiver form by Officer DeLisle prior to an interview with DeLisle and Task Force Officer (TFO)

Eddie Holloway. The officers wanted to interview[2] Woods regarding the drugs and gun that had been found in the hidden compartment. Woods acknowledged his *Miranda* rights on a written form by signing his name below the "*Miranda* Warning." Although Woods verbally acknowledged he understood the "Waiver" section of the form, he refused to sign that portion of the form. TFO Holloway was out of the room when Woods refused to sign the form.

When TFO Holloway returned to the interview room, Officer DeLisle explained that Woods had signed the "Miranda Warning" section of the form, but refused to sign the "Waiver" section. TFO Holloway asked, "Mr. Woods you don't want to talk to us?" Woods responded, "What—to talk about what?" TFO Holloway explained that he wondered if Woods was interested in helping himself out since he was facing serious criminal charges (drugs and gun) and had prior criminal history. Woods asked TFO Holloway, "help myself how?" TFO Holloway explained that the officers were interested in learning about where Woods acquired the drugs and to whom Woods sold drugs. Woods agreed with TFO Holloway that he'd rather just "take [his] lumps." Woods did not provide the requested information, but did admit that the gun belonged to him and the drugs that were found in the car consisted of everything he had at the time. The actual interview lasted less than fifteen minutes.

---

[2] The Government submitted and the undersigned reviewed video and audio-recordings of the interview (Gov't. Ex. #2 and #3, respectively). The beginning of the video-recording was not stationary until after Woods signed the "*Miranda* Warning" section of the form. The remainder of the recording is focused on Woods. The audio-recording lasts less than thirty-five minutes and includes the advice of rights, the interview, and processing of Woods.

Two days later, federal agents from ATF and DEA, as well as a different TFO conducted another interview of Woods. ATF Special Agent John Taylor read a *Miranda* warning card to Woods and then conducted a second interview at which time Woods made similar incriminating statements. At no time did Woods refrain from answering the officers' questions, nor did he request an attorney.

Woods now requests suppression of "the evidence seized as a result of an unlawful stop, an unlawful detention, and any incriminating statements alleged to have been made by Defendant Woods." (Doc. 48 at 4.)

## II.  Conclusions of Law

Woods argues that the evidence seized from his vehicle after a traffic stop should be suppressed based on claims that the traffic stop was pretextual (*i.e.,* the officer who made the stop testified that if it had been someone else, he probably would not have pulled them over) and that he was unlawfully detained after citations were issued for littering and failure to provide proof of insurance. The undersigned disagrees.

### II.A.  Traffic Stop and Detention were lawful.

"A pretextual traffic stop violates the Fourth Amendment." *United States v. Pereira-Munoz*, 59 F.3d 788, 791 (8th Cir. 1995). "It is well established, however, that any traffic violation, no matter how minor, provides an officer with probable cause to stop the driver of the vehicle." *Id*. *See also United States v. Johnson*, 58 F.3d 356, 357 (8th Cir. 1995) (same); *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (en banc) (same). "If the officer is legally authorized to stop the driver, any additional 'underlying intent or motivation' does not invalidate the stop." *Id*. (quoting *United States*

*v. Cummins*, 920 F.2d 498, 501 (8th Cir. 1990)). *See also Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *United States v. Bell*, 86 F.3d 820, 822 (8th Cir. 1996) ("If the officer has probable cause to stop the [traffic] violator, the stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant."); *United States v. Herrerra-Gonzalez*, 474 F.3d 1105, 1109 (8th Cir. 2007) (Even if the officer was mistaken in believing that a traffic violation occurred, a traffic stop does not violate the Fourth Amendment if the mistake was a reasonable one.) Moreover, a traffic stop supported by probable cause "is valid even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot." *United States v. Thomas*, 93 F.3d 479, 485 (8th Cir. 1996).

If an officer has a right to stop a driver, the officer may "conduct an investigation 'reasonably related in scope to the circumstances that justified the interference in the first place.'" *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (en banc) (quoting *United States v. Cummins*, 920 F.2d 498, 502 (8th Cir. 1990)). "This reasonable investigation includes asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose." *Id*.

"Moreover, 'if the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions.'" *United States v. Johnson*, 58 F.3d 356, 357 (8th Cir. 1995) (quoting *United States v. Barahona*, 990 F.2d 412, 416 (8th Cir. 1993)). "The officer may also ask the passenger similar questions to verify the information the driver provided." *United*

*States v. Brown*, 345 F.3d 574, 578 (8th Cir. 2003) (citing *United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002)).

"[A] brief drug scan [by a drug-sniffing dog] at the end of a traffic stop does not require reasonable suspicion." *United States v. Gregory*, 302 F.3d 805, 810 (8th Cir. 2002) (alterations added). "[T]he use of a well-trained narcotics-detection dog – one that 'does not expose noncontraband items that otherwise would remain hidden from public view' - - during a lawful traffic stop, generally does not implicate legitimate privacy interests." *Illinois v. Caballes*, 125 S.Ct. 834, 838 (2005) (quoting *United States v. Place*, 462 U.S. 696, 707 (1983)) (alteration added). Further, "a canine sniff of the exterior of personal property in a public location 'is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure' that it does not constitute a 'search' within the meaning of the Fourth Amendment." *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 647 (8th Cir. 1999) (quoting *Place*, 462 U.S. at 707).

There is no *per se* time limit on all traffic stops, rather the question as to whether a particular detention is reasonable in length requires an intensive review of the facts of each case. "When there are complications in carrying out the traffic-related purposes of the stop, for example, police may reasonably detain a driver for a longer duration than when a stop is strictly routine." *United States v. Olivera-Mendez*, 484 F.3d 505, 509-10 (8th Cir. 2007), citing *United States v. Sharpe*, 470 U.S. 675, 685-87 (1985). Once the police officer decides to allow a routine traffic offender to depart with a traffic citation, a warning, or an "all in the clear," "then the Fourth Amendment applies to limit [in time]

any subsequent detention or search." *Id.* at 648 (alteration added) (finding that a two-minute canine sniff following a legitimate traffic stop was a de minimis intrusion into an individual's personal liability). *See also Gregory*, 302 F.3d at 810 (finding that a lapse of 20 minutes from the beginning of the traffic stop to the completion of the drug sniff was not unduly lengthy).

> When police need the assistance of a drug dog in roadside *Terry* stops, it will in general take time to obtain one; local government police forces and the state highway patrol cannot be expected to have drug dogs immediately available to all officers in the field at all times.

*United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994). A wait time of up to an hour or more (80 minutes) for a drug dog have been found to be reasonable. *Id.* at 916-17; *United States v. White*, 42 F.3d 457, 460 (8th Cir. 1994).

Once a dog alerts to the vehicle for the presence of drug contraband, the police officer has probable cause to search the vehicle without a warrant. *United States v. Yand*, 345 F.3d 650, 656 (8th Cir. 2003); *$404,905.00 in U.S. Currency*, 182 F.3d at 647.

On April 9, 2014, Woods' vehicle was stopped by Officer DeLisle for two reasons—a littering violation and suspicion of a window tinting violation. When Officer DeLisle observed the two potential violations of Missouri law, he also had information that DeLisle was involved in drug trafficking and that there were hidden compartments in Woods' vehicle that were used to transport drugs. While Woods' conduct related to the littering and the window tinting seems rather insignificant, it was proper for Officer DeLisle to stop Woods since he believed violations of the law had occurred. The stop of Woods' vehicle was lawful.

Once the stop was made and Officer DeLisle approached Woods' vehicle, Officer DeLisle detected a faint odor of packaged marijuana and observed a fake i-Phone in the driver's side door pocket that he believed to be digital scales. Although it only took between fifteen and twenty minutes for Officer DeLisle to address the issues related to the traffic citations, it was not unreasonable to extend the stop an additional twenty to thirty minutes in order for the canine officer to arrive. The stop occurred at 12:46 p.m. and the canine officer arrived at 1:24 p.m. That means roughly forty minutes passed between the time Officer DeLisle initated the traffic stop and the time the canine alerted to the presence of controlled substances in Woods' vehicle. Woods was lawfully detained.

When the canine sniff was conducted, the dog provided an alert that controlled substances were contained within the vehicle, which provided the necessary probable cause for a complete search of Woods' vehicle.

The undersigned finds that the traffic stop and subsequent canine sniff of Woods' vehicle were conducted in accordance with the law. Woods' Motion to Suppress the drug and gun evidence based on an allegation that the traffic stop was unlawful, or that the detention of Woods was unlawful should be denied.

**II.B.  The Defendant's Statements are admissible at trial.**

Woods argues that the police were required to cease questioning him when he refused to sign the "Waiver" section of the Portageville Police Department's *Miranda* Waiver form. The undersigned disagrees.

It is undisputed that Woods was properly advised of his rights to remain silent and to counsel before any custodial interrogation took place. *See Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). It is also undisputed that Woods signed the "Miranda Warning" section of the waiver form. The parties disagree as to whether Woods voluntarily agreed to waive his rights.

The Fifth Amendment privilege against self-incrimination is safeguarded after arrest by the mandatory warning procedures set out in *Miranda v. Arizona*, 384 U.S. 436, 467-79 (1966). After giving *Miranda* warnings to a suspect in custody, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473-74. "[A] person's 'right to cut off questioning'" is central to the Fifth Amendment, and the police are required to "scrupulously" honor the assertion. *Michigan v. Mosley*, 423 U.S. 96, 103-04 (1975), quoting *Miranda*, 384 U.S. at 474. To adequately invoke this right and effectively cut off questioning, a suspect must indicate a "clear, consistent expression of a desire to remain silent." *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir. 1995), quoting *United States v. Thompson*, 866 F.2d 268, 272 (8th Cir. 1989).

"[T]o invoke one's right to remain silent, one must unequivocally express his desire to remain silent." *Simmons v. Bowersox*, 235 F.3d 1124, 1131 (8th Cir. 2001), citing *United States v. Al-Muqsit*[3], 191 F.3d 928, 936 (8th Cir. 1999) (reversed in part on

---

[3] In examining the question of a suspect's invocation of his right to counsel, the Court in *Davis v. United States*, 512 U.S. 452, 461 (1994), held that "when a suspect makes an ambiguous or equivocal statement [about wanting an attorney] it will often be good

other grounds). In *Al-Muqsit*, the Eighth Circuit found that a suspect who was given *Miranda* warnings and then indicated that he "wasn't ready to talk about [the crime] at that time" had not sufficiently invoked his right to silence when, after a ten-hour interval, he was again questioned, responded "I don't think right now," and, then minutes later, confessed after further interrogation by police. *See also United States v. Thompson*, 866 F.2d 268, 271 (8th Cir. 1989) (a suspect's indication that he wanted to "sleep on it" and "wait a little while" before being interviewed by police was not sufficient to invoke the right to remain silent).

In order to determine whether the defendant unequivocally invoked the right to remain silent, the defendant's statements as a whole are considered. *Thompson*, 866 F.2d 272. *See also Davis v. United States*, 512 U.S. 452, 458-59 (1994) (whether a suspect has actually invoked his right to counsel is an "objective inquiry," thus, a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.").

The fact a defendant does not sign a waiver form does not, per se, defeat the validity of a waiver of constitutional rights; the holding in *Miranda*. . ., requires that a waiver of rights be made voluntarily, knowingly and intelligently, but does not demand that it be made in writing. *Klinger v. United States*, 409 F.2d 299, 308 (8th Cir. 1969) (defendant refused to sign a waiver and stated that he didn't "sign anything without a

---

police practice for the interviewing officers to clarify whether or not he actually wants an attorney."

lawyer," but he made incriminating statements anyway; when he said that "he didn't want to talk anymore" the questioning stopped).

When the circumstances indicate that a defendant knew of his right to remain silent and to have counsel, yet intelligently waived that right by voluntarily answering questions, his refusal to sign a written waiver does not render a confession or an incriminating statement inadmissible. *See United States v. Johnson*, 529 F.2d 581, 584 (8th Cir. 1975); *United States v. Biondo*, 483 F.2d 635, 642-43 (8th Cir. 1973).

Also, relevant to this inquiry is whether an accused has knowingly and voluntarily waived the *Miranda*[4]**,** rights – an inquiry which depends upon the facts of each particular case, including the defendant's background, experience, and conduct. *United States v. Boyd*, 180 F.3d 967, 977 (8th Cir. 1999). "The government has the burden of proving that the defendant 'voluntarily and knowingly' waived his rights." *Id.* This burden is a heavy one. *Lamp v. Farrier*, 763 F.2d 994, 996 (8th Cir. 1985) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). "The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions of the person interrogated." *Butler*, 441 U.S. at 373.

The appropriate test for determining the voluntariness of a confession is "whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will." *United States v. McClinton*, 982 F.2d 278, 282 (8th Cir. 1992) (quoting *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989)). In analyzing the

---

[4] The Court in *Thompson* found that there was nothing in the record to suggest trickery by law enforcement officers or any persistent efforts "to wear down the defendant's resistance and make him change his mind." *Thompson*, 866 F.2d at 271.

"overborne will" test, the court looks at the conduct of the officers and the capacity of the suspect to resist pressure to confess. *Id.* (citing *Colorado v. Connelly*, 479 U.S. 157 (1986)).

There is convincing evidence that Woods knew and understood his rights, and voluntarily answered questions after he was given the *Miranda* warning on April 9, 2014. Although Woods did in fact refuse to sign the "Waiver" section of the *Miranda* Waiver form, when TFO Holloway clarified whether Woods wanted to talk, Woods asked "talk about what?" When TFO Holloway explained that they were curious about whether Woods wanted to help himself out, based on the charges he was facing, Woods replied, "Help myself how?" TFO Holloway proceeded to explain that the officers wanted to know where Woods acquired his drugs and who bought them. Woods indicated he didn't want to implicate anyone by agreeing with TFO Holloway that he would "take [his] lumps." Woods did not provide the officers with the "helpful" information they initially sought. As the interview continued, Woods admitted that the gun was his and that the drugs in the vehicle were all he had at the time. The questioning of Woods related to the evidence found in his vehicle lasted less than fifteen minutes. During that time, Woods appeared very comfortable, often leaned forward as he talked to the officers, and used hand gestures to express himself. Woods also had prior experience with law enforcement based on his two prior felony convictions and his prior interactions with Officer DeLisle for municipal violations.

Woods did not unequivocally and unambiguously invoke his *Miranda* rights rather he simply refused to sign the "Waiver" section of the form. Following that refusal, TFO

Holloway properly inquired as to whether Woods wanted to talk. Woods' responses (i.e., "talk about what" and "help myself how?") were not an invocation of the *Miranda* rights to remain silent or to have an attorney present during questioning. Furthermore, Woods offered no testimony to rebut that of Officer DeLisle or TFO Holloway concerning the circumstances leading to his incriminating statements, and he does not contend that either of the officers improperly induced him to speak after the warnings were given.

Woods' statements to Agent Taylor were made after Woods was given the *Miranda* warning a couple of days after his arrest. There is no allegation of misconduct by Agent Taylor or the other officers involved in that interview. The record supports that during the interview with Agent Taylor, Woods was properly advised of his *Miranda* rights, waived those rights, and voluntarily made incriminating statements. Woods did not offer any testimony at the suppression hearing to rebut the Government's version of the circumstances surrounding the statement to Agent Taylor, nor has he contended that Agent Taylor in any improper way induced him to talk after the warnings were given.

The undersigned finds that Woods made an intelligent and voluntary waiver of his rights prior to making the post-arrest statements, and further finds his admissions were made voluntarily. Woods' Motion to Suppress statements should be denied.

### III. Conclusion

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Defendant's Motion to Suppress Evidence (Doc. 19) be **denied**.

Further, the parties are advised that they have fourteen days in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained. Failure to file timely objections may result in a waiver of the right to appeal questions of fact. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

*Abbie Crites-Leoni*
_____
 ABBIE CRITES-LEONI
 UNITED STATES MAGISTRATE JUDGE

Dated this 16th day of December, 2014.